FILED & ENTERED

DEC 28 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Fisher      DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>JEFFREY L. HAYDEN,<br><br>      Debtor and Debtor-in-Possession. | Case No.  1:14-BK-11187-MT<br><br>Chapter 11<br><br>Adv. No. 1:14-ap-01182-MT<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL** |
| JEFFREY L. HAYDEN, Debtor and Debtor in Possession,<br><br>      Plaintiff,<br>v.<br><br>Tasos Denos, an individual, Matthew Denos solely as Trustee of the Tasos Denos Living Trust, and Ziria Investments, LLC, a California Limited Liability Company; and DOES 1 through 10,<br><br>      Defendants. | Date:   November 9, 10, 13, 16 and 17, 2015<br>Time: Various<br>Place:  Courtroom 302<br>          21041 Burbank Blvd.<br>          Woodland Hills ,CA 91367 |

Commencing on November 9, 2015 and continuing on November, 10, 13, 16 and 17, 2015, a trial on the above captioned adversary proceeding was heard and conducted with respect to the prima facie case – issues regarding the value of the subject transfers, consideration paid for the transfers at the time the transfers were made, and whether

c:\users\fisher\local
settings\temp\order#110024#bacf6396-
8e6c-4db5-887f-49e418a4ff51.docx

Jeffrey L. Hayden was insolvent at the time of the transfers or became insolvent as a result of the transfers, the Honorable Maureen A. Tighe, United States Bankruptcy Judge, presiding.  Robyn B. Sokol and Jessica Bagdanov of Ezra Brutzkus Gubner LLP appeared on behalf of Jeffrey L. Hayden, the debtor and debtor in possession ("Debtor or Plaintiff").  Michael H. Weiss of Weiss & Spees, LLP appeared on behalf of defendants Tasos Denos ("Tasos"), Matthew Denos as Trustee of the Tasos Denos Living Trust ("Denos Trust"), and Ziria Investments, LLC ("Ziria," and collectively with Tasos and the Denos Trust, "Defendants").

In addition to considering the testimony of Jeffrey L. Hayden, Matthew Denos, Craig Lipsey, Stephen M. Cook, Rey Cano, Anthony E. Fitzgerald, and Steven W. McCormick, the Court considered the Joint Pretrial Stipulation and Order entered on October 16, 2015 [Docket No. 65]("JPO"), Plaintiff's Trial Brief [Docket No. 77], and Trial Brief of Defendants [Docket No. 75].   The following Exhibits were admitted into evidence: Plaintiff's Exhibits 1, 2, 3, 4, 6, 7, 11, 12, 13, 13A, 14-30, 33-35, 39-43, 46-52, 54-56, 60-74 and Defendants' Exhibits 1003, 1004, 1006, 1007, 1008, 1009, 1026, 1028, 1030, 1031, 1045, 1047.

Based on the Court's consideration of the above pleadings, examination of Debtor, Matthew Denos, Craig Lipsey, Stephen M. Cook, Rey Cano, Anthony E. Fitzgerald, and Steven W. McCormick, the evidence before it, the stipulated facts set forth in the JPO, the arguments presented by counsel, the evidentiary objections filed by the Defendants and raised by the Defendants and Plaintiffs, evidence, testimony, and finding notice of this matter being appropriate and good cause appearing therefore, the Court hereby issues the following Findings of Fact and Conclusions of Law.

### **FINDINGS OF FACT**[1]

1.      Debtor initiated this bankruptcy case by the filing of a voluntary petition under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") on March 10,

---

[1] The Court makes these findings of fact and conclusions of law pursuant to Fed. R. Bankr. Proc. 7052.  To the extent any finding of fact constitutes a conclusion of law, it shall be considered a conclusion of law.  Likewise, to the extent a conclusion of law contains a finding of fact, it shall be considered as such.

Printed on Recycled Paper

1 | 2014 ("Petition Date").  Debtor is operating as the Debtor in Possession of this

2 | bankruptcy estate ("Estate").  JPO ¶ 1.

3 |     2.    Debtor has standing to bring this adversary proceeding on behalf of the

4 | Estate pursuant to 11 U.S.C. § 1107.  JPO ¶ 4.  The Debtor brings this action solely in

5 | his capacity as Debtor in Possession of this Estate.  JPO ¶ 5.

6 |     3.    Defendant Tasos is an individual who at all relevant times resided in

7 | Greece.  JPO ¶ 6.

8 |     4.    Defendant Matthew Denos as the Trustee of the Denos Trust is an

9 | individual who at all relevant times resided in the Central District of California.  Matthew

10 | Denos ("Matthew") is sued solely in his capacity as Trustee of the Denos Trust.  JPO ¶ 7.

11 |     5.    At all times relevant herein, Matthew acted as the agent for Tasos and has

12 | full power of attorney for Tasos.  JPO ¶ 8.

13 |     6.    Defendant Ziria is a California limited liability company that, at all times

14 | herein mentioned, transacted business in the Central District of California.  JPO ¶ 9.

15 |     7.    The Denos Trust is the 100% member of Ziria.  JPO ¶ 10.

16 |     8.    Matthew is the manager of Ziria.  JPO ¶ 11.

17 | **A.    THE SYCAMORE PROPERTY**

18 |     9.    Prior to the Petition Date, Debtor owned that certain parcel of improved real

19 | property located at 6228 Sycamore Meadows, Malibu, California 90265, Assessor's

20 | Parcel Nos. 4460-013-003 and 4460-013-004 ("Property").  The Property was

21 | encumbered by two deeds of trust: the first in favor of Luther Burbank Savings in the

22 | principal amount of approximately $2,000,000.00 ("First Trust Deed") and the second in

23 | favor of Michael Balzary, as Trustee of the Michael Balzary Living Trust dated December

24 | 11, 1995, in the principal amount of approximately $205,000.00 ("Second Trust Deed").

25 | JPO ¶ 12.

26 |     10.    On or about August 29, 2012, a third deed of trust encumbering the

27 | Property was recorded for the benefit of defendant Tasos, in the original principal amount

28 | of $342,502.58 ("Third Trust Deed").  JPO ¶ 13.

Printed on Recycled Paper

11.     The Third Trust Deed was recorded to provide security for a loan made at the rate of 18% per annum to Debtor by Tasos in the principal amount of $342,502.58 which included prepayment of interest and for which the Debtor received $300,000. Exhibits 13, 13A, Testimony of Jeffrey Hayden ("Hayden Testimony"), Transcript of November 10, 2015 – Trial Day 2 ("Transcript 2"), pp. 123-126.

12.     The Property was purchased by Debtor on or about October 25, 2011 for $3,150,031.   JPO ¶ 14.  The Property was purchased from the Michael Balzary Living Trust dated December 11, 1995.   Hayden Testimony, Transcript 2, p. 103.

13.     Debtor purchased the Property as his home.  *Id*.  Before purchasing the Property, Debtor spent 6 to 8 months looking for a home.   Hayden Testimony, Transcript 2, pp. 103:23-104:2.

14.     Debtor funded the purchase of the Property with a first position loan from Luther Burbank in the amount of $2,050,000, a second position loan from the Michael Balzary Living Trust dated December 11, 1995 in the amount of $205,000 and cash from Debtor's saving in the approximate amount of $895,031.  Hayden Testimony, Transcript 2, p. 108.

15.     Prior to the purchase of the Property by Debtor, a home inspection and property inspection was conducted and the Property passed these inspections.  *Id*.

16.     A few months after the purchase of the Property, Debtor claims to have first noticed cracks in the top coat of the concrete floors.  *Id*. at pp. 108:23-109:11.

17.     Debtor attempted to resolve the construction issues that he noticed with Marmol Radziner, the architectural firm that designed and built the Property directly, but had little success.   *Id*. at p. 109:13-22.

18.     On or about April 26, 2012, Debtor retained the Law Offices of Larry Kent to represent him in connection with alleged construction defects involving the Property.  *Id*. at pp. 109-110, Defendants' Exhibit 1026, p. D883.   Debtor originally retained Law Offices of Larry Kent on an hourly basis.  *Id*. Due to Debtor's lack of savings resulting from his failed investment in a cryotherapy business and the uncertainty of his monthly

distributions arising from his non-controlling membership interest in certain limited liability companies (discussed in more detail below), Debtor altered his payment arrangement with the Law Offices of Larry Kent from an hourly fee contract to a contingency fee contract. *Id.*

19.    On August 30, 2012, Debtor commenced the action entitled *Jeffrey L. Hayden v. Marmol Radziner, et.al.*, Case No. SC 118242 ("Lawsuit") thereby commencing an action to recover on the Construction Claims, defined below.  JPO ¶ 15, Exhibit 12, Hayden Testimony, Transcript 2, pp. 110-111.

20.    LiMa Consulting, Inc. was retained by Larry Kent as an expert for the Debtor in the Lawsuit.   Hayden Testimony, Transcript 2, p. 110.

21.    LiMa Consulting, Inc. prepared a "Preliminary Defect List" which was attached to the Complaint For: 1. Negligence and 2. Breach of Implied Warranty.   Exhibit 12, TRIAL JH-000646 – 000654.  This "Preliminary Defect List" provides that "This document is prepared for mediation purposes only.  Protected under applicable Evidence Codes."  *Id.*   LiMa Consulting, Inc. also prepared three versions of reports entitled "Plaintiff Scope, Plaintiff Cost [sic] Cost of Repair Estimate" ("Lima Report(s)").   Each and every page of each one of the LiMa Reports contains the following language "This document is prepared for mediation purposes only.  Protected under applicable Evidence Codes."   Exhibit 3, TRIAL JH-000061, Exhibit 5, TRIAL JH-000171-173, Exhibit 1007, D101-D124.  The LiMa Reports were prepared solely for litigation purposes.  Exhibit 3, TRIAL JH-000061, Exhibit 5, TRIAL JH-000171-173, Exhibit 1007, D101-D124, Hayden Testimony, Transcript 2, p. 114.  LiMa's initial report was attached to the complaint in the Construction Defect Action.  {Ex. 1006 at pp. D135-37.}

22.    The purpose of the Lima Reports and the Lawsuit was so that Debtor could obtain a cash settlement with the defendants to the Lawsuit.   Hayden Testimony, Transcript 2 pp. 112, 114.

//

//

**B.    THE TRANSFERS**

23.    Plaintiff transferred the real property commonly known as 6228 Sycamore Meadows Drive, Malibu, California (the "Property") to Tasos pursuant to that certain "Purchase Agreement" dated as of December 30, 2013. {Ex. 1030.}  Plaintiff transferred title to the Property on January 7, 2014 when the parties caused a quitclaim deed to be recorded with the Los Angeles County Recorder's Office. {Ex. 68.}

24.    Thereafter, Tasos transferred the title to the Property to the Trust.  The Trust thereafter transferred title to Ziria. {Exs. 69-71.}

25.    On December 13, 2013, Plaintiff assigned his rights in the Construction Defect Action to Tasos pursuant to that certain "Assignment of Rights."  {Ex. 1008.} Simultaneously, Tasos assumed Plaintiff's obligations under Plaintiff's agreement with the Law Offices of Larry Kent pursuant to the agreement styled "Adoption Agreement Related to Attorney-Client Contingent Fee Contract dated September 25, 2012 between the Law Offices of Larry Kent and Jeffrey Hayden." {Ex. 1026.}

26.    As used herein, the "Transfer Date" means January 7, 2014.

**C.    PLAINTIFF'S DEBT TO DENOS.**

27.    Tasos made a loan to Plaintiff on or about August 28, 2012 in the original principal amount of $342,502.58 to be used to invest in Plaintiff's cryotherapy business, Cryobu, LLC (the "Denos Loan").  Matthew testified that the loan included about eight months of prepaid interest.

28.    On or about March 1, 2013, Matthew invested another $50,000 in Plaintiff's cryotherapy business.

29.    The cryotherapy business went out of business in the spring of 2013 when Plaintiff had trouble with the City of Malibu in connection with the permits to deliver gas needed for the operation of that business.  As a result, Plaintiff testified that he lost about $1,000,000 in connection with that venture.

30.    To induce Tasos and Matthew to make their investments with Plaintiff, he presented them with a financial statement dated as of May 30, 2011 {Ex. 1045}, which showed the following assets:

| | |
|---|---|
| Current Assets | $3,667,909 |
| Investments | $255,000 |
| Real Estate | $21,181,667 |
| Liabilities | $(14,704,231) |
| Net Worth | $10,400,345 |

31.    Even though Exhibit 1045 was over a year old, there is no evidence Plaintiff ever advised Defendants that Exhibit 1045 was in anyway inaccurate prior to Taos and Matthew making their investments with Plaintiff in the late summer of 2012.

**D.    PLAINTIFF'S TROUBLES WITH BARRY BEITLER AND HIS HEALTH**

32.    Plaintiff testified that he had significant health problems requiring extended hospitalization and home health care starting in the spring of 2009, which caused Plaintiff to withdraw from active participation in some of his business affairs.  These problems persisted intermittently through and after the Transfer Date.  Plaintiff further testified that he was frequently on various forms of pain medications throughout that period and that Matthew was aware of these problems.  Plaintiff appeared, at trial and through his testimony and documentary evidence, to have been competent and knowledgeable about hs financial and litigation matters.  He keeps track of transactions and calculates numbers in his head and appears to be an effective negotiator of his own interests.

33.    Plaintiff's business partner was Barry Beitler ("Beitler") through the following limited liability companies:

American Funding Group, LLC
American Funding Group 1, LLC
American Funding Group 2, LLC
American Funding Group 3, LLC
American Funding Group 4, LLC
American Funding Group 5, LLC

American Funding Group 6, LLC

For convenience, American Funding Group is referred to "AFG."  AFG owns AFG 5 and AFG 6.  In most instances, Plaintiff owned 50% of each AFG entity and Beitler owned the other 50%.  Beitler was the managing member of each of the LLCs.  AFG 1 through 6 owned one or two parcels of income producing real estate.  The real estate was encumbered by liens that secured loans that Beitler and Plaintiff had personally guaranteed.

34.    Plaintiff testified that virtually all of his income of over $60,000 per month was derived from the AFG entities.

35.    Sometime during 2011, Plaintiff testified that a dispute with Beitler arose over the running of the various AFG entities.  On January 5, 2012, Beitler sued Plaintiff in connection with these disputes in the action styled: *Beitler v. Hayden* (LASC Case No. BC476322).  {Ex. 19.}  Subsequently, Plaintiff counter-sued Beitler in that action and brought several claims against Beitler derivatively on behalf of several of the AFG entities.  {Ex. 20.}  No expert testimony was presented as to the value of these claims and Plaintiff's testimony was vague and unconvincing.

36.    The record reflects that Defendants were aware of these disputes and litigation with Beitler.  There is no evidence that they took advantage of these disputes in any way.

37.    By the fall of 2013, Plaintiff testified that his monthly income from the AFG entities had dropped to as little as $28,000.

E.    THE LIMA REPORTS

38.    On June 28, 213, LiMa prepared a report showing that the amount of the damages from the defects totaled $715,859.  {Cano Declaration, Adv. Dkt. No. 67, Ex. 1 at pp. 19-21}.  Plaintiff gave a copy of this report to Matthew in connection with the negotiations to purchase the Property described below.  That June 28, 2013 report was also attached to the Declaration of Anthony E. Fitzgerald {Adv. Dkt. No. 67} as Exhibit "B" at p. 77.

39.     On November 6, 2013, LiMa updated its defect report to reflect damages of $765,743.   That report was attached to the settlement agreement of the Construction Defect Action, as well as the assignment of that action.  {Ex. 1007 at pp. D101 to D124, Ex. 1008 at pp. D100-128.}

40.     On or about, September 23, 2014, Plaintiff authorized Mr. Kent to increase the settlement demand from $864,825.10 to $988,747.28 based upon further inspections of the Property by a Mr. Martinet.  {Ex. 1047.}

**F.    DEFENDANT'S ACQUISITION OF THE PROPERTY AND THE CONSTRUCTION DEFECT ACTION**

41.     In the late summer or early fall of the 2013, Plaintiff was having significant trouble paying his obligations because his flow of funds from the Beitler entities had been significantly reduced.

42.     Plaintiff failed to make his September 2013 interest payment to Tasos.

43.     Plaintiff then advised Matthew that he was interested in selling the Property and asked if Tasos was interested in purchasing it.  Plaintiff also advised Matthew that he was talking to other people about purchasing the Property, including local Malibu brokers, Eytan Levin and Darlene Hutton.

44.     Starting on November 1, 2013, Tasos or Matthew paid the interest due on the senior Luther Burbank and Balzary deeds of trust on the Property.   Defendants continued to pay that interest along with insurance and property taxes for the Property until the Transfer Date.  Plaintiff had considerable leverage in the transaction because Defendants had lent him large sums for the failed cryotherapy business and risked having their third deed of trust foreclosed out if Plaintiff failed to pay the first and second deeds of trust.

45.     By November 11, 2013, the parties had begun to include their lawyers in the negotiations.  {Ex. 16 at p. P11.}

46.     By November 23, 2013, the parties had reached an agreement in principle for the sale of the Property and the Construction Defect Action.  {Ex. 16 at p. P12.}

Printed on Recycled Paper

47.     Plaintiff, through his then retained bankruptcy attorney, Michael Kogan, negotiated the sale of the Property to Tasos with Matthew's attorneys, Scott Wyman and Andrew Smyth.

48.     Mr. Kogan asked Debtor in an email dated November 23, 2013 if Debtor could "defend the transaction," Debtor responded to Mr. Kogan and Matthew that Tasos' offer was "the best available.  The other [potential buyer] asked for my furniture and all of my electronics."  {Exhibit 1009 at p. D862.}  Plaintiff copied Defendants on that email. Immediately, thereafter, Matthew obtained the Cano Appraisal upon the advice of counsel. {Ex. 1005.}

49.     The parties entered into a formal agreement {Ex. 1030} on December 30, 2013.  The parties' counsel drafted and negotiated that agreement.

50.     On December 13, 2013, Plaintiff assigned the Construction Defect Action as well as his attorney retainer agreement with Mr. Kent to Tasos.  {Exs. 1008 and 1026.}

51.     The transaction closed on January 7, 2014 (the Transfer Date) when escrow recorded a quitclaim deed.  {Ex. 70.}

52.     While Plaintiff was on medication and had very serious medical problems during this time, there was no indication whatsoever that his judgment was impaired.  His emails and correspondence indicate a mastery of the details of the transactions.

## G.     CONSIDERATION PAID FOR THE PROPERTY

53.     The parties dispute the amount of the total consideration paid by Tasos for the Property.

54.     Tasos claims that he paid:

| | |
|---|---|
| Assumption of Luther Burbank Loan | $2,000,000.00 |
| Assumption of Balzary Loan | $205,000.00 |
| Cancellation of Denos Loan | |
| Principal | $342,502.58 |
| Interest (4.25 months) | $21,834.54 |
| Advances to protect Denos Loan | |
| Insurance | $21,344.00 |
| Luther Burbank Interest (2.25 payments) | $14,531.24 |

| | |
|---|---|
| Balzary Interest (2.25 payments) | $1,489.45 |
| Taxes | $18,829.33 |
| Escrow Fees | $4,074.32 |
| Payments to Plaintiff per the Purchase Agreement | $129,008.64 |
| Paid to Debtor outside Escrow | $17,004.00 |
| Cash Paid at Closing | $170,996.00 |
| Note secured by Matthew's house | $170,996.00 |
| Write Off by Mathew of $50,000 Cryobu deposit | $18,750.00 |
| TOTAL | $3,136,360.10 |

55.     Plaintiff claims that the payments for cash payments outside of escrow insurance, Luther Burbank interest, Balzary interest, real estate taxes and the write-off of the Cryobu deposit totaling $91,948.02 are included in the $129,000.64 of payments paid outside of escrow.  Matthew's testimony in his deposition suggests that this is the case.

56.     Accordingly, the Court concludes that the amount of consideration paid by Defendants was $3,044,292.54.

## H.     FAIR MARKET VALUATION OF THE PROPERTY.

57.     The starting point in determining whether Defendants paid reasonably equivalent value is the "fair market value" or "fair value" of the Property on the Transfer Date.   "[F]air market value" is "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction."   *Black's Law Dictionary* 1691 (9th ed. 2009).

58.     The parties submitted the following appraisals to establish fair market value into evidence:

a)     The Retrospective Appraisal Report of Craig Lipsey {Exs. 1 and 2} (the "Lipsey Appraisal"), which valued the Property as of January 7, 2014 to $3,750,000;

b)     The Appraisal of Rey Cano dated November 25, 2013 {Ex. 1005} (the "Cano Appraisal"), which appraised the Property as of that date to be $2,300,000; and

c)     The Appraisal of Gary G. Young of the Granite Appraisal Group dated October 27, 2014 {Exhibit 1003}(the "Granite Appraisal"), which valued the Property as of that date to be $3,500,000.

59.     Defendants submitted the rebuttal written testimony of Anthony E. Fitzgerald {Adv. Dkt. No. 69} as well as his oral testimony.  Mr. Fitzgerald criticized the methods employed in both the Cano and Lipsey Appraisals.  Fitzgerald was a very credible and convincing witness.

60.     Defendants objected to the Lipsey Appraisal under Fed. R. Evid. 702 {Adv. Dkt. 81} on the ground that his methodology was inconsistent from proper practice.  The Court overruled that objection on the basis that the methodology went to the weight of his testimony.

61.     Plaintiff submitted the Granite Report to demonstrate that the lot size and usable area of the Property in the Cano appraisal was incorrect.

62.     The Court need not accept any of the experts' opinions of value.  As the finder of fact, the Court is "not compelled wholly to accept or wholly to reject" the testimony of an expert witness, and is "entitled to credit part of [the witness's] testimony and discredit the balance[.]"  *Moore v. Chesapeake & O. R. Co.*, 340 U.S. 573, (1951) (Black, J., dissenting); see also *Ortco Contrs., Inc. v. Charpentier*, 332 F.3d 283, 292 (5th Cir. 2003) (fact finder is entitled to consider all credibility inferences, or consider any part of an expert's testimony or reject it completely.") (quotations and citations omitted).

63.     The transaction was an arm's length transaction in which both parties were represented by experienced and able counsel.  Defendants were not insiders.  Defendants did not use their leverage as a secured creditor to get a "deal."  As such, the Court is inclined to trust the market absent a price that shocks the conscience.  *Pereira v. Wells Fargo Bank, N.A. (In re Gonzalez)*, 342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006).  Likewise, Plaintiff and Matthew were personal friends both before and after the sale of the Property.  Both were knowledgeable about and understood the nature of the transactions consummated.

64.     The wide disparity of appraised values here reinforces common sense and experience of many courts that "real estate appraisals are subject to a significant margin of error."  *In re Mr. D Realty Co.*, 27 B.R. 359, 366 (Bankr. S.D. Ohio 1983); see also

*Fraize v. Beneficial Mortg. Corp. of NH (In re Fraize)*, 208 B.R. 311, 313 (Bankr. D.N.H. 1997) ("valuation" is "less than an exact science.").   The Court has considered the appraisals to evaluate whether the price paid by Defendants "shocks the conscience" of the Court.  The Malibu residential market is also quite varied and heterogeneous, leaving considerable room for disagreement between different appraisers.  The property at issue is unique in many respects, so such disparity between appraisals is not surprising.

65.    The appraiser themselves, especially Mr. Lipsey, concede that their appraisals are subject to a 5% to 10% margin of error.

66.    Each appraisal assumes a willing and informed buyer and seller, the absence of special financing and does not include any adjustment for transaction costs. Each appraisal suffers from certain deficiencies.  None is totally persuasive.

67.    The Lipsey Appraisal suffers from the following deficiencies:

a)    Lipsey used a weak method to compare properties.  Lipsey selected six comparable properties and then adjusted their values as if they had the same level of defects similar in degree as the Property.  {Exhibit 2}  However, none of the comparables had similar defects as the ones that inflicted the Property.  Thus, they were not truly comparable.  A superior and apparently more accepted approach would have been to compare the Property in good condition and then make an adjustment for the costs and effects of the construction defects listed in the LiMa Report  {Exs. 1007 and 1008.}  See Bell, *The Impact of Detrimental Conditions on Property Values* at 381-82 attached as Exhibit "A" to Adv. Dkt. No. 81, which Mr. Fitzgerald discussed in his testimony.

b)    Lipsey used the settlement amount of Construction Defect Action ($500,000) to make his adjustments for the construction defects.  {Lipsey Decl. ¶ 14} (Adv. Dkt. No. 70).  He justified his use of that number based upon USPAP Statement 3, which provides: "Data subsequent to the effective date may be considered in developing a retrospective value as a confirmation of trends."  There is no evidence of a market in any such claims and Lipsey was in no position to opine on any such market.  Further, USPAP Statement 3 requires a cut-off date and forbids use of information beyond that

date except in certain circumstance not found here.  This is consistent with the law that requires to the Court to consider what was known or knowable on the transfer date.  *4100 W. Grand LLC v. TY Grand LLC (In re 4100 W. Grand LLC)*, 481 B.R. 444, 457 (Bankr. N.D. Ill. 2012) citing *Morris Commc'ns NC, Inc. v. Ashley Commc'ns, Inc. (In re Morris Commc'ns )*, 914 F.2d 458, 466 (4th Cir. 1990) (the critical time in determining reasonable equivalent value is when the transfer is  made).

      c)     USPAP Standard Rule 1.5(b) requires analysis of all sales within three years of the appraisal date.  When examined about his analysis of the accretion of the value of the Property from the time of Plaintiff's purchase in May 2011 to the valuation date, Lipsey testified the accretion from $3,150,000 to $3,750,000 on the valuation date was consistent with his general understanding of appreciation in the Malibu market.  Plaintiff testified that he discovered the defects after his purchase.  Thus, the Plaintiff paid an "unimpaired" price when he acquired the Property.  Given Lipsey's use of the $500,000 negative adjustment from the settlement of the Construction Defect Action, his analysis suggests he used an "unimpaired" value of $4,250,000 for the Property for him to reach his conclusion of $3,750,000.  Thus, by implication, Lipsey's appraisal assumes the "unimpaired" value of the Property had increased from $3,150,000 to $4,250,000 in about 30 months.  There is no evidence that the market increased by that amount over that period.  In summary, the value of Lipsey's appraisal is further compromised because he compared the "apple" of the "unimpaired" value of May 2011 to "orange" of the "impaired" value of January 2014.

      d)     In his deposition and at trial, Lipsey admitted that he had not had the information concerning the settlement of the Construction Defect Action; if he had, he would have valued the Property at $3,500,000.

      e)     Consistent with common sense, a buyer faced with a list of construction defects such as those found in the LiMa Report {Exs 1007 and 1008} and as disclosed to Tasos would expect to get a discount of least as much as the amount of the disclosed defects, *i.e.*, $765,743.

f)     Lipsey's Appraisal is not persuasive because Plaintiff did not obtain it until after Plaintiff instituted this adversary proceeding.

68.    Although the Cano Appraisal was done at the time of the sale and before any litigation was commenced, the Cano Appraisal does not resolve value for the following reasons:

a)     Like the Lipsey, Cano selected six comparable properties and then adjusted their values as if they had the same level of defects similar in degree as the Property.  As noted above, this is a disfavored appraisal method.

b)     Cano appears to have understated both acreage and the usable property. Plaintiff presented no evidence or argument of what the value would have been under Cano's analysis if he had used different acreage or usable property numbers.

c)     Cano appears to have counted the defects twice by deducting the amount of the defects first in the comparable and then a second time.

d)     The Cano Appraisal benefits from it not being made with the eye towards litigation and at a time very close to the transaction.

69.    The Granite Appraisal is also not completely convincing but does shed some light on the other appraisals:

a)     It fails take into account the construction defects.

b)     It is dated over nine months after the transfer date of January 7, 2014

c)     It was made for underwriting a loan, which suggests that it is likely to be more conservative.

d)     It undercuts Lipsey's appraisal that market trends support an increase in the unimpaired value of the Property to $4,250,000.

e)     Assuming a 5% to 10% margin of error, the unimpaired value of the Property appears to be somewhere between $3,150,000 and $3,850,000.

70.    The Court did not consider the testimony of Steven M.  Cook ("Cook") {Exhibit "4"} concerning the "actual" cost to repair the construction defects listed in the LiMa Report because no buyer of the Property could have evaluated Cook's opinion in

that it was issued well after the Transfer Date.  Cook's testimony was not persuasive and sis not appear to take all factors into account.

71.   For valuation purposes, the Court has disregarded any testimony by Plaintiff that the amount needed to correct the defects was "inflated" or "just to get a settlement."  It has influenced the Court's assessment of Hayden's credibility in other respects.

72.   Plaintiff testified to receiving one "informal" offer to purchase the Property from an unnamed buyer represented by Darlene Hutton for $3,500,000.  Plaintiff testified that the buyer did not consummate that offer because the buyer had to sell another house and could close quickly enough to meet Plaintiff's needs.  Plaintiff testified that he told Ms. Hutton about the construction defects and that the buyer had inspected the Proerty but not in Plaintiff's presence.  This offer suggests that the value of the Property on the Trasnfer date was no more than $3,500,000.

73.   Plaintiff also testified that he received another oral offer from Eytan Levin's in-law, which was for the same price as paid by Tasos.  Plaintiff rejected that offer because it required Plaintiff to sell his personal property, which Plaintiff valued at $400,000.  {Ex. 16 at p. P16.}  This offer, which is less favorable than the one consummated by Defendants, tends to support the fact that Defendants paid reasonably equivalent value.  There was also sufficient time to test the market with numerous relators aware of the sale so that Debtor could have obtained a higher offer if one were possible.  These decisions to reject such offers also indicate Debtor was not under extreme time pressure to sell the Property.

74.   After taking into effect the construction defects of $750,000, the fair market value of the Property was $2,750,000 on the Transfer Date.  There is no valuation or consideration of Plaintiff's personal property, as Plaintiff's valuation of his personal property was inconsistent and unconvincing.

75.   As admitted by Plaintiff and Lipsey, Plaintiff's evidence of value ($3,750,000), when adjusted to reflect the amount of construction defects disclosed to

Tasos in the LiMa Report, would be reduced to $3,500,000.  After taking into account the typical costs of sales (7%), creditors would have expected to recover $3,255,000.  Given that the consideration paid was $3,044,412.84, this represents a sale equal to 93.53% of fair market value.

76.    Determination of reasonable equivalence takes into account all of the facts and circumstances surrounding the transaction.  See, e.g., *Onkyo Eur. Electronics GMBH v. Global Technovations, Inc. (In re Global Technovations),* 694 F.3d 705 (6th Cir. 2012).

77.    In addition to the foregoing, the Court considers the following factors important in ascertaining whether Plaintiff received reasonably equivalent value: (i) Tasos' right to foreclose on the Property; (ii) his failure to declare a formal default on the Tasos Debt, (iii) his failure to start foreclosure proceedings on the Property; (iv) his payment of the secured debt, taxes and expenses of the Property prior to the execution of a formal agreement and (iv) his unfortunate situation of being a small junior lien behind a large senior lien to Luther Burbank Savings Bank of $2,000,000.

78.    Had Tasos foreclosed, Plaintiff could not have avoided that transfer.  *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994).  There is no evidence that creditors would have received anything from such a foreclosure sale.

79.    Considering the "cash component" of the sale, i.e., the amount over and above the secured claims, Plaintiff, and therefore unsecured creditors, received $488,279.64 on the Transfer Date.  {Exhibit 1029}  There is no evidence unsecured creditors would have received that sum, if any, from a foreclosure sale.

80.    Given the totality of the circumstances, the amount paid by Tasos for the Property was reasonably equivalent.

I.    **VALUATION OF THE CONSTRUCTION DEFECT ACTION**

81.    The Construction Defect Action settled on March 17, 2014 for $485,000, of which Defendants received $250,000 after payment of attorneys' fee and costs.  {Exhibit 1007}  The Court cannot take that settlement amount into evidence into consideration

1 because it occurred after the Transfer Date. *Krommenhoek v. Natural Resources*

2 *Recovery (In re Treasure Valley Opportunities, Inc.)*, 166 B.R. 701 (Bankr. D. Idaho

3 1994).

4    82.    Plaintiff has the burden of proof on the value of the Construction Defect

5 Action. The absence of evidence redounds to the detriment of the party with the burden

6 of proof, *i.e.*, Plaintiff. *Otero v. Buslee*, 695 F.2d 1244, 1248-49 (10th Cir. 1982);

7 *Martinez v. E.J. Korvette, Inc.*, 477 F.2d 1014, 1016-17 (3d Cir. 1973).

8    83.    In his trial brief, Plaintiff claims that it was worth $800,000 based on certain

9 alleged admissions of Matthew. {Adv. Dkt. No. 77} These alleged admissions were in an

10 email from Matthew to Plaintiff dated November 22, 2013. {Ex. 16 at p. P14.} Matthew

11 denies that he what said in that email was an admission. Rather, he testified that it

12 represented his understanding of what Plaintiff told him. After considering the testimony

13 of the parties, the Court concludes that Matthew's statements in that email are not

14 admissions as to the value of Construction Defect Action, but rather a recounting of his

15 conversation with Plaintiff. Matthew was a credible and convincing witness who

16 appeared to have a good memory of the transaction.

17    84.    Plaintiff's $800,000 valuation is facially unsupportable. First, the amount of

18 the defects disclosed to Defendants was only $765,342. {Ex. 1007.} After taking into

19 account the contingency fee agreement with Mr. Kent {Ex. 1026}, the net recoverable

20 amount would have been reduced by 30% to 35% percent less, and at least another

21 $82,769.40 in expenses. This suggests a maximum value of $414,704.90, because

22 litigation is uncertain. This in turn suggests that the fair value of those claims is

23 significantly less than that.

24    85.    In connection with the assignment of the Construction Defect Action {Ex. 10

25 26}, Tasos agreed to assume and become substituted for Plaintiff as the party

26 responsible for his liabilities to his counsel, Larry Kent, for at least $82,939.40 in costs

27 then incurred. {Exhibit 1026 at p. D877} Further, had Defendants abandoned the

28 litigation or discharged Mr. Kent, they would also have been liable for Debtor's then

outstanding legal fees payable to Mr. Kent of $93,465. {Id.} Had Plaintiff abandoned the Construction Defect Action, he would have been liable for these sums. {Ex. 1026 at p. D883-884.} Thus, by assuming these obligations, Tasos gave consideration for the Construction Defect Action of at least $176,404.40.

86. There is no evidence of any opinion from Mr. Kent delivered to any party about the value of the Construction Defect Action prior to the Transfer Date.

87. There is no evidence of any settlement offers made prior to the Transfer Date.

88. The cost to correct in the LiMa Report {Ex. 1008} does not necessarily coincide directly with the value of the Construction Defect Action because there might be no negligence by the defendants in that action or the defects might have arisen from independent causes.

89. Plaintiff undermined his credibility as to the value of those claims by testifying that they might have been "inflated" to extract a settlement.

90. To the extent Plaintiff has offered his opinion on the value of the Construction Defect Action, the Court finds it inadmissible because the value of such a claim would require expert testimony. *Paxton v. County of Alameda*, 119 Cal. App. 2d 393, 398-99 (1953). Further, Plaintiff laid no foundation to give a lay opinion under Fed. R. Evid. 701. Plaintiff generally did not appear to have any real knowledge of the construction defects and avoided answering questions that did not fit his theory of the case.

91. Given this absence of evidence on value of the Construction Defect Action, Plaintiff has not met his burden of proof concerning its value. Hence, the Court finds Defendants paid reasonably equivalent for that asset.

**J.    SOLVENCY.**

92. 11 U.S.C. § 548 has no provision for avoiding a transfer as fraudulent merely because a debtor is not paying his debts as they come due. However, Cal. Civ. Code § 3439.02(c), which is applicable here under Section 544(a)(3), provides that a

Printed on Recycled Paper

debtor who is generally not paying his or her debts as they become due is presumed to be insolvent.  The presumption is rebuttable.  *Neumeyer v. Crown Funding Corp.*, 56 Cal. App. 3d 178, 188 (1976).

93.    Plaintiff argues that the following evidence demonstrates Plaintiff's failure to pay his debts as they come due:

a)    The default declared by First Regional Bank to enforce Plaintiff's guaranty of approximately $1,600,000;

b)    Plaintiff's inability to service his debt on the Property, including the payment of taxes and insurance;

c)    Plaintiff's default on his unsecured credit line of approximately $233,000 with Commercial Bank of California; and

d)    Plaintiff's inability to pay his lawyers.

94.    The Ninth Circuit rule for determining whether a debtor is generally not paying debts is as follows:

In determining whether a debtor is paying its debts generally as they become due, the court should look at more than the amount and due dates of the indebtedness. The court should also take into account such factors as the number of the debtor's debts, the proportion of those debts not being paid,  the duration of the nonpayment, and the existence of bona fide disputes or other special circumstances alleged to constitute an explanation for the stoppage of payments.  The court's determination may be affected by a consideration of the debtor's payment practices prior to the period of alleged nonpayment and the payment practices of the trade or industry in which the debtor is engaged. *Liberty Tool, & Manufacturing v. Vortex Fishing Systems, Inc., (In re Vortex Fishing Systems, Inc.)*, 277 F.3d 1057, 1072 (9th Cir. 2002).

95.    Applying this standard, the Court finds that Plaintiff was not generally paying his debts as they come due and therefore is presumed to be insolvent.

96.    Fed. R. Evid. 301 governs the effect of that presumption as follows:

In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption.  But this rule does not shift the burden of persuasion, which remains on the party who had it originally.

97.     Thus, Defendants must come forward with proof that Debtor was solvent. If they do so, Plaintiff still must establish insolvency by the preponderance of the evidence.

98.     11 U.S.C. § 101(32) defines "insolvent" in relevant part as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property at fair value."

99.     The sole testimony on insolvency was that of Plaintiff.  His testimony was unsupported by specific documentary evidence, was contradicted by other statements he had made, and was generally vague and unconvincing. Plaintiff had difficulty remembering many details when pressed on cross-examination and sought to portray his financial situation as much worse than it appeared to be.  Plaintiff testified that, as of the Transfer Date, he had liabilities over $27,813,000 as follows:

| AFG 2 | $2,700,000 |
| AFG 4 | $1,850,000 |
| AFG 5 | $18,000,000 |
| AFG 6 | $1,800,000 |
| Beitler Oral Contract | $230,000 |
| Luther Burbank | $2,000,000 |
| Balzary Trust | $205,000 |
| Denos | $342,000 |
| Blank Rome | $65,000 |
| Commercial Bank | $236,000 |
| Chase Credit Cards | $27,000 |
| Medical Bills | $15,000 |
| Taxes | $233,000 |
| Accountants | $10,000 |
| | $27,813,000 |
| All amounts are rounded to the nearest thousand. | |

100.     Many of these liabilities and assets were contingent.   "[C]ontingent liabilities must be included in the computation of total indebtedness" for the purpose of computing insolvency.  2 *Collier on Bankruptcy* ¶ 101.32[5] (16th ed. 2011).  "[I]f there is a contingent asset or contingent liability, that asset or liability must be reduced to its present, or expected value."  *In re Imagine Fulfillment Services, LLC*, 489 B.R. 136, 146

(Bankr. C.D. Cal. 2013).    Failure to present proof of the expectancy can lead to the exclusion of the asset or liability from the computation.    See, e.g., *In re Sierra Steel, Inc.*, 96 B.R. 275, 278 (B.A.P. 9th Cir. 1989)(reducing value of a contingent liability to a present value of zero where evidence shows zero liability on claim), citing, *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) (hypothesizing that where there was a 1% chance that a contingency would occur, the liability is discounted to reflect that chance.)

101.    Applying this rule, the Court finds the following to be the <u>expected amount</u> of those contingent liabilities and assets on the Transfer Date:

|  | Asserted Amt. | Expected Amt. |
|---|---|---|
| AFG 2 | $2,700,000 | $0 |
| AFG 4 | $1,850,000 | $0 |
| AFG 5 | $18,000,000 | $0 |
| AFG 6 | $1,800,000 | $300,000 |
| Beitler | $230,000 | $0 |
| Luther Burbank Savings | $2,000,000 | |
| Balzary Trust | $205,000 | |
| All amounts are rounded to the nearest thousand. | | |

Plaintiff's liabilities in connection with AFG 2, 4 and 5 are his guarantees.  There was no evidence that any of those entities had defaulted on their guarantees, either before or after the Transfer Date.  Hence, the Court finds that the likelihood that Plaintiff would answer on these guarantees to be zero.  Plaintiff offered no contrary evidence.  As to AFG 6, Plaintiff is liable for the entire amount of the claim and the obligee had the right to pursue Plaintiff without regard to the collateral that secured the primary loan or his co-guarantor, Beitler.  Plaintiff testified, however, that the real property that secured the primary obligation was worth $1,400,000.  If the obligee obtained a judgment, Plaintiff would have subrogation rights in that collateral.  Also, he would have contribution rights against Beitler.  Plaintiff produced no evidence that the obligee would not pursue its foreclosure rights or its rights against Beitler.  Given the shortfall in the value of the collateral and associated costs of collection, the Court finds the expected amount for which Plaintiff would be liable to be $300,000.

102.   Plaintiff testified that he had claims against Beitler far in excess of the amount he owed Beitler.   Therefore, the Court concludes that the expected amount of the Beitler claim to be zero.

103.   Plaintiff transferred the Property to Tasos subject to the liens of Luther Burbank Savings and the Balzary Trust.   Plaintiff testified that both liens secured purchase money financing.   Hence, under Cal. Civ. Code § 580d, Plaintiff could not be personally liable to either lender.   Hence, after the transfer the expected liability on these debts was zero.   This is further reinforced by Plaintiff's allegations concerning value which show that both lenders were significantly over secured.

104.   After the transfer of the Property and the Construction Defect Action, Plaintiff had the following assets and liabilities (excluding his AFG assets and liabilities):

| Assets: | |
|---|---|
| Consideration form the Sale of Property | $488,000 |
| Other Cash | $30,000 |
| Watch | $6,000 |
| AV Equipment | $32,000 |
| Subtotal | $556,000 |
| | |
| | |
| Liabilities: | |
| Blank Rome | $65,000 |
| Accountants | $10,000 |
| Credit cards | $27,000 |
| Medical Bills | $15,000 |
| IRS/FTB | $233,000 |
| Commercial Bank of California | $230,000 |
| Subtotal | $580,000 |
| Insolvency | $(24,000) |

105.   Thus, the question of insolvency turns on the net the value of the AFG assets.

106.   Plaintiff claims that his interest in AFG, which includes the sum of his rights in AFG 5 and AFG 6 are effectively zero on the Transfer Date.   Plaintiff presented no expert testimony on this issue.   Rather, he argued that his interest in AFG could not be transferred because such a transfer required Beitler's consent and Beitler would not

give his consent.  Plaintiff, however, submitted no evidence that he sought Beitler's consent or that Beitler refused to give such consent.  He also argued that the transfer would create substantial tax liabilities.  Again, Plaintiff presented no admissible evidence on the tax consequence of a sale.  His assertions concerning the tax consequences appeared to be vague and lacking in any detailed analysis.

107.    Further, the Court notes that Plaintiff has incurred over $1,000,000 in legal fees in this case fighting with Beitler over the value of the AFG asset.  Likewise, Plaintiff admitted that he will be able to fund his 100% plan from the AFG asset even if he were to be unsuccessful in litigation against Beitler and Defendants.

108.    Defendants point to the financial statement dated May 31, 2011 {Ex. 1045} for the proposition that Plaintiff represented to Tasos and Matthew when Tasos made his loan that the value of his share of the AFG assets were as follows:

|  | AFG 5 | AFG 6 |
|---|---|---|
| Mkt. Value | $16,400,000 | $715,000 |
| Loan Bal. (Plaintiff's share) | $9,440,550 | $969,461 |
| Net value | $6,959,450 | $(254,461) |

This reflects a net value of Plaintiff's interest in AFG of $6,704,989 in 2011.  Notably, Exhibit 1045 contains no indication that Plaintiff's interest should be adjusted in any way for taxes or otherwise to reflect the nature of Plaintiff's interest in the assets described.

109.    The primary value of AFG is the value of AFG 5.  Plaintiff testified Beitler obtained an appraisal of the property owned by AFG 5 dated January 23, 2015 indicating that the value of the underlying property had increased to $40,000,000.  Plaintiff testified that valuation was approximately correct.  He also testified that the amount of the loan against that property was about $18,000,000.  Thus, using the same methodology used in Exhibit 1045, Plaintiff's interest in AFG 5 was $11,000,000 in 2015.  Thus, the value of the AFG 5 asset increased by slightly more than $4,000,000 from May 30, 2011 to January 25, 2015.  Since about 70% of that appreciation occurred before the transfer date, the Court finds that the value of the AFG 5 asset on the Transfer Date was $9,760,000.

110.    After taking into account the expected amount of the AFG 6 liability ($300,000), the Court finds that the value of Plaintiff's interest in AFG to be $9,460,000.

111.    The Court finds that Plaintiff was solvent by over $9,000,000 on the Transfer Date.  Defendant has rebutted any presumption of insolvency.  While Debtor appeared to have created a liquidity issue based on his earlier financial decisions, his claims of insolvency were exaggerated and lacking any real foundation or evidence.

## CONCLUSIONS OF LAW

112.    To the extent that any Finding of Fact is a Conclusion of Law, that finding it is incorporated in these Conclusions of Law by this reference.

113.    This Court has jurisdiction over this action under 28 U.S.C. § 1334.

114.    Venue is proper in this Court under 28 U.S.C. § 1409.

115.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(H).

116.    This is an action to avoid certain transfers under either 11 U.S.C. § 548(a)(1)(B) or 11 U.S.C. § 544(a)(2) which incorporates by reference Cal. Civ. Code §§ 3439.01 et seq.

117.    This action seeks to avoid the following transfers: (i) the transfer of the Property on or about January 7, 2014; and (ii) the transfer of the Construction Defect Claim on or about December 13, 2013.

118.    Plaintiff has the burden of proof by the preponderance of evidence that Plaintiff received less than reasonable equivalent value for the transfers of the Property and the Construction Defect Claim.

119.    Having shown that Plaintiff was not paying his debts as they came due at the time of the transfers under Cal. Civ. Code § 3439.02(c), there is rebuttable presumption that Plaintiff was insolvent at the time of the transfers.

120.    Defendants therefore have the burden of coming forward with proof that Debtor was insolvent.  However, the ultimate burden of proof on the issue of solvency always remains with the Plaintiff under Fed. R. Evid. 301.

Printed on Recycled Paper

121.   California's fraudulent transfer statutes are similar in form and substance to the Bankruptcy Code's fraudulent transfer provisions.  *In re Corp. United Energy*, 944 F.2d 589, 594 (9th Cir. 1991).  As such, the standards under both federal and state law are the same for all practical purposes.  *Hayes v. Palm Seedlings Partners-A (In re Agric. Research and Tech. Group, Inc.)*, 916 F.2d 528, 534 (9th Cir. 1990).

122.   In determining whether Plaintiff received reasonable equivalent value, the Court views the term "reasonably equivalent" to mean "approximately" or "roughly" equivalent.  *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540 n.4 (1994).

123.   The determination of reasonably equivalent value is made upon all of the facts and circumstances of the case and from the perspective of Plaintiff's creditors.  *In re Prejean*, 994 F.2d 706, 708 (9th Cir. 1993).

124.   In calculating reasonably equivalent value, transaction costs are considered.  *In re Ozark Restaurant Equipment Co.*, 850 F.2d 342, 345 (8th Cir. Ark. 1988).

125.   In calculating reasonably equivalent value, the known costs of remediating the construction defects to the Property must be taken into account.

126.   The Court may, to establish insolvency at a prior date through "retrojection," use an approach in which later-in-time financial reports or indices showing insolvency are coupled with an analysis of whether or not changes occurring in the intervening period would have affected the debtor's solvency. *Hopkins v. D.L. Evans Bank (In re Fox Bean Co.)*, 287 B.R. 270, 282 (Bankr. D. Idaho 2002), aff'd, 144 Fed. Appx. 697 (9th Cir. 2005). The Court used this method to establish the value of Plaintiff's interest in AFG.

127.   The Construction Defect Claim is an asset separate from the Property because the sale of the Property to the Defendants does not transfer the claim to them by operation of law.  *Krusi v. S. J. Amoroso Const. Co.*, 81 Cal. App. 4th 995, 1005 (2000).

128.   Having found that Defendants paid reasonably equivalent value for the Property.   That transfer cannot be avoided under either 11 U.S.C. §§ 544(a)(3) or 548(a)(2)(B).

129.    Having found that Plaintiffs' failed to introduce admissible evidence on the value of the Construction Defect Action, Plaintiff has failed to meet his burden of proof that Defendants failed to pay reasonably equivalent value for that asset.  That transfer cannot be avoided under either 11 U.S.C. §§ 544(a)(3) or 548(a)(2)(B).

130.    Having found that Plaintiff was not insolvent on January 7, 2014, neither the transfer of the Property nor the Construction Defect claim can be avoided under either 11 U.S.C. §§ 544(a)(3) or 548(a)(2)(B).

### 

Date: December 28, 2015

Maureen A. Tighe
United States Bankruptcy Judge